IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

GLENDA R. GRASS,          )
                                )
     Plaintiff,           )
                                )
     v.                 )         NO. 12-3044
                                )
CAROLYN W. COLVIN,     )
COMMISSIONER OF SOCIAL   )
SECURITY,             )
                                )
     Defendant.       )

<u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

Pending before the Court are the Plaintiff's Motion for Summary Judgment or Remand and the Defendant's Motion for Summary Affirmance.

## I. PROCEDURAL HISTORY

Plaintiff Glenda R. Grass filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on March 17, 2008, alleging an onset date of January 1, 2002.  Her applications were denied initially on June 17, 2008 and upon reconsideration on August 25,

2008.  On April 5, 2010, a hearing was held before Administrative Law Judge ("ALJ") David Thompson.  The Vocational Expert ("VE") was Bonnie L. Gladden.

On August 19, 2010, ALJ Thompson denied the Plaintiff's claims.  On December 28, 2011, the Appeals Council denied the Plaintiff's Request for Review.  The Plaintiff filed this timely action.

## II. BACKGROUND

### A. Introduction

Plaintiff Grass was born in 1965 and was 36 wears old at her alleged onset date of January 1, 2002.  The Plaintiff's previous work experience included employment as a bus driver from 1992 to 1996, a club manager from 1999 to 2001, a cashier in 2002 and a waitress from 2005 to 2006.  The Plaintiff states she has not performed substantial gainful activity since her onset date and was insured for the purposes of DIB through at least June 30, 2011.

### B. Medical evidence

On June 6, 2007, Plaintiff Grass was treated at the OSF Medical

Group for lower back pain that had been persistent over the last three or four years.  An October 10, 2007 notation indicated that Plaintiff's back pain was unresponsive to Flexeril, NSAIDS or Vicodin, and a lumbosacral spine X-ray revealed moderate disc space narrowing and endplate osteophytes at T-11-T-12 with the compressions of degenerative disc disease.  Shortly thereafter, on October 26, 2007, the Plaintiff was noted as having right ankle pain and swelling and an X-ray revealed joint narrowing with osteophytes at the right ankle joint and a large spur on the plantar surface of the calcaneus with the impressions being moderately severe osteoarthritis of the ankle joint and a calcaneal spur.

On February 27, 2008, the Plaintiff had her first appointment with Dennis R. Caffery, M.D., at the OSF Medical Group for her chronic right ankle pain that had been getting worse over the past few months and persisted when she was sitting down because of swelling in her legs and with walking.  The physician noted that "[t]he more she does the more she has pain," and the physical examination found the right ankle to be "very warm to palpation" with pain upon inversion and eversion.  The back

examination also found upper sacral tenderness.

On March 7, 2008, the Plaintiff had another appointment with Dr. Caffery. A physical examination found tenderness and swelling in the right ankle. The plan was for her to use an ankle training brace when ambulating. A March 21, 2008 notation indicated the Plaintiff's moderate to severe right ankle arthritis was at its "maximum improvement" and that she was "going to be in chronic pain and have chronic dysfunction of [the right] ankle." The physical examination found swelling at 2+ and tenderness in the right ankle that was encased in an air case brace, a "[v]ery tender" spot lateral to the right sacroiliac joint and pain with the straight leg raise test.

On April 21, 2008, the Plaintiff received treatments for severe right ankle and lower back pain. Dr. Caffery noted that "lifting causes quite a bit of pain" in the Plaintiff's lower back and that her markedly degenerated ankle" forced her to "wear[] the Aircast but she cannot do much beyond walking short distances." The physical examination found the Plaintiff's back to be "[d]iffusely tender especially over the right side" with a positive

straight leg raise, and she also had a limited range of motion in the right ankle with chronic swelling. The impressions were a right ankle degenerative disc disease, and side effects of nausea and vomiting from Tramadol.

On May 14, 2008, the Plaintiff underwent a consultative examination by Vittal V. Chapa, M.D. The Plaintiff reported that she was unable to stand or sit for long periods of time with symptoms beginning in 2001 despite a prior right knee surgery. Upon physical examination, the Plaintiff was found to walk with a limp and an antalgic gait favoring the right ankle and unable to walk on her toes and heels because of the right ankle pain. She was also noted to have a decreased range of motion and swelling in the right ankle. The impressions were right ankle arthritis and muscle-mass difference in lower extremities.

On May 28, 2008, non-examining State-agency reviewer Francis Vincent, M.D., completed a physical RFC assessment form checking off boxes to indicate the Plaintiff capable of sedentary work, with occasional posturals. This assessment was affirmed by non-examining State-agency

reviewer Towfig Arjmand, M.D., on August 22, 2008.

On June 4, 2008, Dr. Caffery observed that Plaintiff's "osteoarthritis medicine doesn't seem to be working very well . . . [s]he still has tremendous pain in the right ankle." The physical examination found that she had an enlarged and tender right ankle with a limited range of motion. Soon thereafter, in a June 24, 2008 notation, Dr. Caffery observed "Nabumeton caused her to be ill and Meloxicam really didn't work." Upon examination, her right ankle was tender to palpation with a limited range of motion and pain upon motion was found.

On August 4, 2008, Dr. Caffery noted that Plaintiff attempted to work at a factory earlier after the onset of her symptoms but was "having so much pain in the right ankle and dysfunction that she could not continue to work there." The Plaintiff reported chronic pain and stiffness in the back that made it difficult to get out of bed or out of a chair after sitting a while. The physical examination found the right ankle to be painful to palpation, with flexion and dorsiflexion, and with inward and outward rotation and diffuse swelling. The back examination further found

tenderness bilaterally and a range of motion limited to flexion to about 30 degrees and extension to only about 10 degrees without pain. The Plaintiff's gait was also a limp on the right side. The diagnoses were advanced degenerative disease of arthritic nature of the right ankle, degenerative disc disease of the lower back with osteoarthritis, a history of attention problems, sinusitis, and leg length discrepancy. Moreover, Dr. Caffery stated that "[w]ork is going to be difficult to find because of the chronic back pain and stiffness that she has in her back. Sitting for a long period of time is not a good option. Patient is not able to stand or to walk for any length of time."

A September 5, 2008 right ankle X-ray revealed osteoarthritis with osteophyte formation and some sclerosis as well as plantar calcaneal spur. An October 31, 2008 notation indicated the Plaintiff had cervical neuropathy at C8, and a subsequent cervical spine X-ray (following complaints of left arm paresthesias) revealed early degenerative changes with posterior osteophytes causing indentation on the neural foramen from C5 to C7.

By November 3, 2008, the Plaintiff was found to have decreased sensation over the lateral portion of her left hand and little finger. Dr. Jeffrey Stewdill's November 17, 2008 report indicated that the electrodiagnostic manifestations of acute radiculopathy have not yet developed" since it "typically take[s] at least 2-3 weeks to evolve" and the Plaintiff's onset of the symptoms had been only a week prior.

On January 7, 2009, the Plaintiff was treated for "a lot of swelling in her right ankle and [] advanced osteoarthritis of the ankle." The medication list included Meloxicam, Furosemide, Albuterol, Doxycyline Hyclate, Prophyxyphene napslate-acetaminophen, Ketoprofen, and Oxybutynin. Then on January 28, 2009, the Plaintiff was treated for right ankle pain that was causing her to have "a lot of difficulty walking." The physical examination found a 1+ swollen right ankle with tenderness and pain with motion and bilateral shoulder pain with abduction and returning to a neutral position. The diagnoses were osteoarthritis of the ankle and shoulder pain likely related to rotator cuff arthritis.

Subsequently, Dr. Caffery noted on March 30, 2009 that Plaintiff was

sleeping "about two to three hours a night and [had] difficulty getting her mind to stop." The physical examination found her right ankle to be tender. By June 11, 2009, the Plaintiff stated the right ankle was "hurting all the time" to the point where she couldn't "stand to do dishes or laundry for a very long period." He also noted sleeping problems. The physical examination found her right ankle to be tender to palpation and swollen.

On August 3, 2009, an ankle X-ray ankle revealed findings suggestive of plantar fasciitis and an MRI found a chronic partial tear of the posterior tibiofibular ligament, a partial longitudinal split tear of the peroneus brevis a 6mm loose body likely representative of synovial osteochondromatosis and a degenerative edema in the adjacent medial malleolus. An August 10, 2009 notation provided that Plaintiff could not pay for a $60.00 Augmentin prescription.

On August 26, 2009, an MRI on the Plaintiff's right shoulder revealed degenerative changes of the acromioclavicular joint with joint space narrowing. The impressions were partial thickness and bursal surface tear of the supraspinatus tendon superimposed on chronic rotator cuff

tendinosis, mild subacromial bursitis, and hypertrophic bone spurring and inflammatory changes at the acromioclavicular joint. On September 29, 2009, the physical examination found the Plaintiff's ankle to be tender to palpation and with motion and chronically swollen. The next day, the physical examination found right shoulder pain with abduction over 90 degrees and right ankle pain with motion. Her Paxil prescription was also noted to be ineffective. A November 4 2009 brain MRI revealed a 3-4 mm saccular aneurism arising from the leftward anterior communicating artery region with possible lobulation. On November 19, 2009, the Plaintiff was treated for dizziness, headaches, leg pain and hip pain.

On January 13, 2010, the Plaintiff was treated for diffuse pain over the shoulders, neck, upper back and lower back with difficulty raising and lowering her arms. The physical examination found diffuse tenderness over the upper back and neck and pain with abduction bilaterally. Poor sleep and memory loss were also indicated. Then on February 25, 2010, the Plaintiff began treatment with Sean Meagher, M.D., complaining of "daily headaches that are varied in their location for approximately eight months,"

blurred vision, intermittent dizziness, and memory loss. A review of her systems found vision problems, including blurred vision despite glasses, intermittent leg claudication and cold hands or feet, dyspnea with activity and at rest, polydipsia, muscle weakness, back pain, arthraglias, memory lapses or loss, and difficulty speaking.

On March 31, 2010, treating Dr. Caffery issued a medical source statement ("MSS"), finding that Plaintiff could only occasionally lift and carry up to 10 pounds because of the joint arthritis in her right ankle as evinced by X-rays, the degenerative spine disease as evinced by MRIs and pain in her ankles, back, and right hip. The physician opined that Plaintiff was limited to occasional reaching, handling, fingering, feeling, and pushing and pulling bilaterally with no reaching overhead. Dr. Caffery also limited the Plaintiff to standing and walking 30 minutes and sitting 6 hours in an 8-hour workday with the rest of the time lying down because of the advanced osteoarthritis in her right ankle and advanced degenerative spinal disease. Additionally, the Plaintiff was not to operate right foot controls and only occasionally operate left foot controls because of the severe pain

she has with movement of the right foot. The physician also opined the Plaintiff should never climb stairs, ramps, ladders, scaffolds, balance, stoop, kneel, crouch, or crawl because of the advanced osteoarthritis in her right ankle.

On April 12, 2010, Dr. Caffery wrote a letter indicating treatment of the Plaintiff since February 27, 2008 for advanced synovitis and osteoarthritis of the right ankle that rendered her "unable to work and . . . unemployable."

### C. Plaintiff Glenda Grass's testimony

The Plaintiff testified she is 5'5" tall, weighed 200 pounds and is right-handed. She lives in an apartment accessible by elevator and her highest level of education was the 9th grade without a general education degree. Because of her impairments, she cannot reach overhead with her right arm, has problems writing, has trouble picking up and often drops glasses a couple of times weekly but could pick up coins with her left hand, and it takes her longer to button up shirts. She thought she could sit about 30 to 45 minutes and stand 1.5 minutes at a time and was advised by a heart

specialist not to lift. Her cane and wheelchair help her to walk, but use of a crutch caused shoulder strain and the use of her cane causes hip pain. She also noted severe daily headaches, and that she could not stoop or kneel, but could crawl in emergencies.

The Plaintiff also testified that she had a hard time brushing and washing her hair because of her shoulder, that it took longer to get dressed, she could prepare only simple meals with the microwave and wash dishes on a bench or stool. She never does laundry, vacuums, dusts, mops or sweeps, and shops only with a motorized cart while accompanied by someone else to lift the bags for her. Her pain medications were only a "little bit" effective, causing her to be "sick" (blurred vision, nausea, vomiting), or made her sleep all day. She had been unable to go to physical therapy due to a lack of insurance.

### D. Vocational expert testimony

The VE listed the Plaintiff's past relevant work as a school bus driver (DOT# 913.463-010), a cashier (DOT# 211.465-010), and a waitress (DOT# 311.477-030). The ALJ questioned whether a hypothetical

individual with the Plaintiff's age, education and past work experience who could perform light work with two hours standing & walking, occasional use of right foot controls, occasional climbing ramps and stairs and crouching, and never climbing ropes, ladders or scaffolds could perform the Plaintiff's past relevant work. The VE responded that such an individual could still perform the Plaintiff's past relevant work as a cashier. The ALJ then added occasional overhead reaching with the dominant upper extremity, and the need to avoid concentrated exposure to odors, fumes, dusts, gases, extreme temperatures and to hazards of a greater degree than in a typical house. The VE responded that Plaintiff's past relevant work as she performed it was eliminated, but the individual could perform it as it is generally performed (with a reduction in numbers). The VE also testified such an individual could perform work as a food checker (DOT# 211.482-014), phone order clerk (DOT# 209.567.014), and telemarketer (DOT# 299.357-014).[1] The VE was not asked and did not indicate that her testimony was consistent with the DOT.

---

[1]The VE also testified that 4 or more absences or being less than 80% productive in an 8-hour workday was unemployable.

<u>E. The ALJ's decision</u>

On August 19, 2010, ALJ Thompson issued an unfavorable decision. The ALJ found the Plaintiff to have severe impairments of a status-post broken ankle with arthritis but retained the ability to perform light work, lift 10 pounds frequently and 20 pounds occasionally, stand 2 hours in an 8-hour workday, occasionally use foot controls with the right foot, occasionally climb ramps and stairs, occasionally crouch, and never climb ropes, ladders, or scaffolds. Based upon the VE's testimony, the ALJ then concluded the Plaintiff could perform her past relevant work as a cashier II.

The Plaintiff claims the ALJ's decision is marred by legal error. Specifically, she asserts the ALJ erred in: (1) weighing the medical opinion evidence; (2) assessing the Plaintiff's credibility; and (3) questioning the VE.

## III. DISCUSSION

The Plaintiff alleges the ALJ rendered an improper residual functional capacity determination. Next, the Plaintiff alleges the ALJ rendered improper credibility determinations. Specifically, the ALJ did not

reasonably develop the record before construing the Plaintiff's testimony against her.

Additionally, the Plaintiff asserts the ALJ improperly considered the side effects of the medications.

The Plaintiff further contends the ALJ submitted incomplete hypotheticals to the VE and failed to follow SSR 00-4p.

A. Standard of review

The ALJ's decision must be upheld if it is supported by substantial evidence. See Moore v. Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014). "Substantial evidence" includes "such relevant evidence as a reasonable mind accepts as adequate to support a conclusion." Id. (citations omitted). The ALJ's decision must include a "logical bridge from the evidence to the conclusions sufficient to allow . . . a reviewing court[] to assess the validity of the agency's ultimate findings and afford [the Plaintiff] meaningful judicial review." Id.

B. Residual functional capacity determination

(1)

The Plaintiff first alleges the ALJ rendered an improper residual functional capacity determination. Specifically, the ALJ did not explain why weight was not given to treating physician Dr. Caffery's opinion.

Additionally, the Plaintiff asserts the ALJ improperly gave "some" weight to Dr. Vincent, the non-examining state-agency reviewer.

The Plaintiff asserts that the ALJ failed to explain why weight was not given to the treating physician Dr. Caffery's medical opinion. In his March 31, 2010 medical source statement, Dr. Caffery found that Plaintiff was limited to a sub-sedentary capacity and, according to his April 12, 2010 letter, the Plaintiff was "unable to work and . . . unemployable due to the right ankle disability."

Although the Defendant acknowledges that the ALJ did not explain the weight he afforded to Dr. Caffery's medical opinion, the Defendant contends the fact that the ALJ's residual functional capacity finding conflicts with the limitations assessed by Dr. Caffery is harmless error. The Defendant bases this assertion on the fact that the VE testified–in response to a hypothetical essentially incorporating the limitations opined by Dr.

Caffery–that Plaintiff could perform other work existing in significant numbers in the national economy.

As a general rule, the Seventh Circuit has held that all of the Plaintiff's limitations should be incorporated by the ALJ in posing a hypothetical to the VE. See O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010). As the Plaintiff alleges, however, the ALJ's hypothetical did not incorporate all of her limitations.

The ALJ's hypothetical inquired about an individual who is "limited to the sedentary level as far as lifting and carrying," while Dr. Caffery opined that Plaintiff could only occasionally lift and carry up to 10 pounds. The ALJ asked the VE about an individual "never reaching overhead with the right dominant arm [and] only occasionally gross and fine manipulation of the bilateral hands." However, Dr. Caffery stated the Plaintiff was capable of occasional reaching, handling, fingering, feeling, and pushing and pulling bilaterally with no reaching overhead with either arm." Although the ALJ did not ask the VE about any sitting, standing and walking limitations, Dr. Caffery opined the Plaintiff was capable of standing and

walking 30 minutes and sitting 6 hours in an 8-hour workday with the rest of the time lying down. The ALJ asked about an individual who can "never perform operation of foot controls with the right foot," while Dr. Caffery determined that could Plaintiff not operate right foot controls and only occasionally operate left foot controls. Finally, the ALJ inquired about an individual who could "never balance, stoop, kneel, crouch [and] crawl," while Dr. Caffery's opinion was that Plaintiff could "never climb stairs, ramps, ladders, scaffolds, balance, stoop, kneel, crouch, or crawl. "

Because the hypothetical posed by the ALJ did not incorporate all of the limitations assessed by Dr. Caffery, the Court concludes that the ALJ did not have a proper basis to make a finding regarding the Plaintiff's residual functional capacity. Accordingly, the ALJ's failure to address the limitations as found by Dr. Caffery cannot be overlooked.

Specifically, although the ALJ's hypothetical did not incorporate any sitting, standing and walking limitations, Dr. Caffery's March 31, 2010 medical opinion found that Plaintiff was limited to standing and walking 30 minutes and sitting 6 hours in an 8-hour workday with the rest of the

time lying down.  In response to a question from counsel, the VE testified that lying down during the workday except on scheduled breaks would be impermissible.  Therefore, the ALJ did not consider the treating physician's opinion in rendering a residual functional capacity finding.

Because certain limitations assessed by Dr. Caffery were not considered by the ALJ in posing the hypothetical, the Court is unable to credit the VE's response that Plaintiff retained the capacity to perform work existing in significant numbers in the national economy.  The Court further finds that the ALJ's failure to explain the weight afforded the error is not harmless because the VE's opinion that Plaintiff could perform other work was based on a hypothetical that did not consider all of the limitations as found by Dr. Caffery.

(2)

The ALJ eventually determined, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence

and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."

The United States Court of Appeals for the Seventh Circuit has "repeatedly condemned the use of that boilerplate language because it fails to link the conclusory statements made with objective evidence in the record." Moore, 743 F.3d at 1122 (citing Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2013); Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012); Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012); Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012)). The court observed that the statement does not explain the basis for the residual functional capacity determination . See id. It "puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion." Id. (quoting Filus, 694 F.3d at 868). The court in Moore noted, however, that if the credibility determination is otherwise supported with information in the record, the use of the boilerplate language will not automatically discredit the ALJ's conclusion. See id.

In this case, the Court is unable to conclude that the boilerplate language links the conclusory statements with the objective evidence in the record. The ALJ says little about how the Plaintiff's "statements concerning the intensity, persistence and limiting effects" of her symptoms are not credible to the extent that they are inconsistent with the residual functional capacity assessment. It appears that the ALJ summarily rejected many of the Plaintiff's statements regarding her symptoms.

The Plaintiff notes that, according to 20 C.F.R. § 404-1529 and SSR 96-7p, when there is a medically determinative impairment that could reasonably be expected to cause the alleged symptoms, the ALJ must consider, among many other factors, the claimant's daily activities. "[A]n ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record." Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009). If a claimant's subjective reports of pain are not corroborated by the medical evidence, the ALJ must "develop the record and seek information about the severity of the pain and its effects on the applicant." Id.

It appears the ALJ assumed that because the Plaintiff lived alone, she was capable of engaging in normal daily activities. Moreover, the ALJ appears to find the Plaintiff's testimony that she uses a wheelchair and rarely leaves her apartment is inconsistent with her statement that she has a valid driver's license, a car and her mother pays for her car insurance. The ALJ further found that Plaintiff exhibited no distress during the hearing, where she sat for 1 hour and 20 minutes while standing only once.

It appears that the ALJ construed these and other factors against the Plaintiff without developing the record or seeking additional information. Accordingly, the ALJ failed to link the Plaintiff's statements regarding her symptoms to other evidence in the record. Moreover, as previously discussed, the residual functional capacity assessment was flawed.

For these reasons, the Court is unable to find that the ALJ's decision was supported by substantial evidence. Based on the flawed evaluation of the evidence in the record, the Court finds that remand to the Commissioner of Social Security is appropriate.

Ergo, the Plaintiff's Motion for Summary Judgment or Remand [d/e

10] is ALLOWED in Part.  The Commissioner's decision is Reversed and this action is Remanded.

The Defendant's Motion for Summary Affirmance [d/e 14] is DENIED.

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Clerk shall enter a Judgment.  This case is remanded to the Commissioner of Social Security for further proceedings consistent with this Opinion.

ENTER: November 14, 2014

FOR THE COURT:

 s/Richard Mills
Richard Mills
United States District Judge